**UNITED STATES of America, Appellee,**

v.

**Isadore MARION, Appellant.**

**No. 794, Docket 75–1408.**

United States Court of Appeals, Second Circuit.

Argued March 5, 1976.

Decided May 7, 1976.

---

Oscar B. Goodman, Las Vegas, Nev. (Elliot A. Taikeff, New York City, of counsel), for appellant.

Carl M. Bornstein, Sp. Atty., U. S. Dept. of Justice, New York City (Thomas J. Cahill, Acting U. S. Atty., for the Southern District of New York, John C. Sabetta, Asst. U. S. Atty., New York City, of counsel), for appellee.

Before KAUFMAN, Chief Judge, and SMITH and ANDERSON, Circuit Judges.

IRVING R. KAUFMAN, Chief Judge:

To guard against the realization of Orwellian fears and conform to the constitutional standards for electronic surveillance operations elaborated in *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) and *Berger v. New York,* 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967), Congress enacted Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2510 *et seq.* Title III imposes detailed and specific restrictions upon both the interception of wire and oral communications, and the subsequent use of the fruits of such interceptions, in an effort to ensure careful judicial scrutiny throughout. We are called upon to determine whether one of Title III's strictures—requiring subsequent judicial approval for the incidental interception of communications relating to offenses other than those specified in an initial wiretap authorization, 18 U.S.C. § 2517(5)—applies with equal force to wiretaps conducted under state auspices. For the reasons explicated herein, we con-

clude that § 2517(5) must control our decision, rather than the counterpart provision of New York's wiretapping statute, and that the Government failed to comply with that section before utilizing the intercepted communications in federal grand jury and criminal proceedings.

## I.

A brief overview of the facts relevant to this appeal will help to place the issues raised in their proper context. On December 20, 1973 and January 8, 1974, Isadore Marion appeared before a federal grand jury of the Southern District of New York under a grant of use immunity, 18 U.S.C. §§ 6001–03. He was questioned on the basis of two conversations intercepted and recorded pursuant to eavesdropping warrants issued by a Justice of the New York State Supreme Court on February 3 (the "Lounge order") and March 15, 1972 (the "Delmonico order"). The "Lounge order" authorized electronic surveillance of a telephone at Jimmy's Lounge in Manhattan for the interception of communications relating to various state offenses, including grand larceny by extortion, felonious assault, and conspiracy to commit these crimes, N.Y. Penal Law, Arts. 155, 120, 105. The "Delmonico order", for the telephone of a suite in the Delmonico Hotel, authorized interception of calls relating, *inter alia,* to the state offense of possession of dangerous weapons, N.Y. Penal Law, Art. 265.

In the first conversation, intercepted pursuant to the "Lounge order," Marion asked one Vincent Tortora to "mess up" seven or eight trucks belonging to a New Jersey carter named Capasso.[1] In his December 20 testimony before the grand jury, Marion admitted that he initiated this plan in order to influence Capasso in a pending corporate

vote, but repeatedly asserted that he could not recall the nature of that vote. Though Tortora had offered in the course of the conversation to do the dirty deed as a favor, Marion told him to charge for his services but to "be fair though, 'cause there's good people involved too." In his grand jury testimony, however, he stated that no one other than he and Tortora had been involved and gave an explanation for his request that Tortora exact a fee that was less than wholly convincing.

The second intercepted conversation, recorded pursuant to the "Delmonico order" between Marion and Jack Denero, involved arrangements for delivery of an "unregistered" "thing" to Marion in Las Vegas. In his December 29 grand jury appearance, Marion acknowledged that they were discussing an unregistered pistol but gave several inconsistent reasons why he wanted the weapon.[2] In his January 8 testimony, after declining a proffered opportunity to correct or change his prior testimony, he gave yet another reason—that he had sought the pistol in order to sell it in Las Vegas.[3]

On the basis of the inconsistency between this last declaration and the December 20 statements, Marion was indicted by a federal grand jury for perjury, 18 U.S.C. § 1623(c) (Count 1). His allegedly false and evasive testimony concerning his purpose in seeking the pistol, and less than wholly forthright answers about the truck-wrecking project, constituted the predicate for two counts of obstruction of justice, 18 U.S.C. § 1503 (Counts 2 and 3).

Before trial, Marion moved to have the indictment dismissed because evidence derived from the state authorized electronic interceptions had been presented to the federal grand jury in violation of 18 U.S.C. § 2517(5).[4] Specifically, he averred that no

---

1. This scheme, for reasons not here relevant, was never brought to fruition.

2. "Just kidding around", just testing Denero, really didn't know why, "just to have another pistol around the house", etc.

3. Marion subsequently declined a second opportunity to correct his testimony and was then excused.

4. Section 2517(5) provides:

    (5) When an investigative or law enforcement officer, while engaged in intercepting wire or oral communications in the manner authorized herein, intercepts wire or oral communications relating to offenses other than those specified in the order of authorization or approval, the contents thereof,

application had been made to a judge of competent jurisdiction to obtain authorization for use of the contents of the intercepted communications prior to their presentation to the grand jury. Judge Conner rejected the contention that § 2517(5) had been violated as "totally without foundation" and denied the motion to dismiss the indictment.

After a four-day trial before Judge Conner and a jury in the Southern District of New York, Marion was convicted on all three counts. The Government's proof at trial consisted almost in its entirety of pertinent portions of Marion's testimony before the grand jury on the two dates in question and the tapes of the two intercepted conversations. Judge Conner, on November 20, 1975, suspended imposition of sentence and placed Marion on probation for concurrent terms of three years as to each count.

## II.

"Few threats to liberty exist which are greater than that posed by the use of eavesdropping devices." *Berger v. New York*, 388 U.S. 41, 63, 87 S.Ct. 1873, 1885, 18 L.Ed.2d 1040, 1054 (1967). Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2510 *et seq.*, attempts to heed the Supreme Court's admonitions as it prohibits, in all but a few instances, the interception and disclosure of wire or oral communications. Where the interception may provide evidence of specified serious crimes, however, such activities may be permitted pursuant to the Act's stringent and detailed procedures designed to restrict electronic intrusions into privacy. Under certain circumstances the Attorney General of the United States—or the corresponding state or local prosecuting attorney, where further authorized by state statute—may apply to a judge of competent jurisdiction for an order authorizing such interceptions. § 2516(1), (2). The application must specify the offense for which evidence is sought. § 2518(1)(b)(i). And before granting the application the judge must determine, *inter alia*, that probable cause exists for believing that "communications concerning that offense" will be obtained, § 2518(3)(b), and that other investigative procedures either have been tried and failed, or reasonably appear to be unlikely to succeed (or too dangerous) if attempted. § 2518(3)(c). Finally, the judge's order approving the interception of any wire or oral communication must provide a specific "statement of the particular offense to which it relates." § 2518(4)(c).

Communications intercepted in accordance with the procedures set forth in Title III, and evidence derived therefrom, may be disclosed and used in federal or state criminal and grand jury proceedings *unless* the communication "relat[es] to offenses other than those specified in the order of authorization or approval . . . ." § 2517(5). In such instances, a subsequent application must be made to a judge of competent jurisdiction who shall thereupon determine the good faith of the original application before permitting disclosure or use of the incidentally intercepted communications.

> Such subsequent application would include a showing that the original order was lawfully obtained, that it was sought in *good faith and not as subterfuge search*, and that the communication was in fact incidentally intercepted during the course of a lawfully executed order.

S.Rep. 1097, 90th Cong., 2d Sess., at 12, *quoted in* 2 U.S.Code Cong. & Adm.News, pp. 2112, 2189 (1968); H.Rep. 488, 90th Cong., 1st Sess., at 100.

The framers of Title III presumably intended by this requirement to prevent evasion of the several restrictions upon original

---

and evidence derived therefrom, may be disclosed or used as provided in subsections (1) and (2) of this section. Such contents and any evidence derived therefrom may be used under subsection (3) of this section when authorized or approved by a judge of competent jurisdiction where such judge finds on subsequent application that the contents were otherwise intercepted in accordance with the provisions of this chapter. Such application shall be made as soon as practicable.

applications (e. g., showing of probable cause, enumerated serious crime, ineffectiveness of other investigatory techniques as to that offense). Otherwise, the applicant could easily name one crime while in fact he may have anticipated intercepting evidence of a different crime for which the prerequisites could not be satisfied. Such "subterfuge searches", in addition to their dissonance with Title III, would indeed run afoul of the Fourth Amendment. Without a judge's determination of inadvertence, Title III authorization might rapidly degenerate into what Justice Clark recently termed "the electronic equivalent . . . of a 'general search warrant.'" *United States v. Brodson*, 528 F.2d 214 (7th Cir. 1975).

### III.

These general considerations help to guide our resolution of the specific question posed by this appeal: whether subsequent judicial approval was required by § 2517(5) before communications intercepted pursuant to state court authorized wiretaps could be used in the federal grand jury and criminal proceedings. Before reaching that decision, however, we must first resolve an important threshold issue. The Government contends that whether the fruits of the state wiretap orders may be used in federal proceedings must be determined by reference to New York state law,[5] rather than the federal statute.

**5.** New York Crim.Pro.Law § 700.65(4), the state's counterpart to 18 U.S.C. § 2517(5), provides:

When a law enforcement officer, while engaged in intercepting communications in the manner authorized by this article, intercepts a communication *which was not otherwise sought* and which constitutes evidence of any crime that has been, is being or is about to be committed, the contents of such communications, and evidence derived therefrom, may be disclosed or used as provided in subdivisions one and two. Such contents and any evidence derived therefrom may be used under subdivision three when a justice amends the eavesdropping warrant to include such contents. The application for such amendment must be made by the applicant as soon as practicable. If the justice finds that such contents were otherwise intercepted in ac-

We reject this argument, for we believe it clear beyond peradventure that it runs counter to both the overall scheme and specific provisions of Title III. That Act provides the minimum standard against which the interceptions in question must be judged. *See* S.Rep. 1097, *supra*, 2 U.S.Code Cong. & Adm.News at p. 2187, *quoted in* footnote 9, *infra*. *But compare United States v. Tortorello*, 480 F.2d 764, 781–83 (2d Cir. 1973), *cert. denied* 414 U.S. 866, 94 S.Ct. 63, 38 L.Ed.2d 86 (1974), *with United States v. Manfredi*, 488 F.2d 588, 598 (2d Cir. 1973), *cert. denied* 417 U.S. 936, 94 S.Ct. 2651, 41 L.Ed.2d 240 (1974).

Section 2515 of Title 18 prohibits the receipt into evidence of intercepted communications or their fruits

in any trial, hearing, or other proceeding in or before any court, grand jury, . . . or other authority of the United States, a State, or a political subdivision thereof if the disclosure of that information would be in violation of *this* chapter. (Emphasis supplied).[6]

Any aggrieved person, as defined by 18 U.S.C. § 2510(11), may move to suppress the contents or fruits of an intercepted communication in a federal *or* state trial, hearing, or other proceeding on the grounds that "the communication was unlawfully intercepted", that the authorizing order was insufficient, or that the interception failed to conform with that order. 18 U.S.C. § 2518(10)(a).[7]

cordance with the provisions of this article, he may grant the application. (emphasis supplied).

**6.** "[§ 2515] does apply across the board in both Federal and State proceeding." S.Rep. 1097, *supra, quoted in* 2 U.S.Code Cong. & Adm. News at p. 2185 (1968).

**7.** "The words 'unlawfully intercepted' are themselves not limited to constitutional violations," but include a failure to satisfy requirements of Title III as well. *United States v. Giordano*, 416 U.S. 505, 527, 94 S.Ct. 1820, 1832, 40 L.Ed.2d 341, 360 (1974) (suppressing wiretap-derived evidence for failure to have the U.S. Attorney General or specially designated Assistant Attorney General authorize application to judge for order approving interceptions).

██ Here, of course, the two conversations in issue were used in federal proceedings. Thus, despite the fact that the interceptions were made pursuant to a state court authorization, at the very least the other requirements of Title III—including § 2517(5)—must be satisfied.[8] But whether the proceedings be federal or state, interpretation of a state wiretap statute can never be controlling where it might impose requirements less stringent than the controlling standard of Title III.[9] If a state should set forth procedures *more* exacting than those of the federal statute, however, the validity of the interceptions and the orders of authorization by which they were made would have to comply with that test as well. *See, e. g., United States v. Manfredi, supra,* 488 F.2d at 598 n. 7; S.Rep. 1097, *supra, quoted in* 2 U.S.Code Cong. & Adm.News at p. 2187 (1968) and note 9, *supra.*

The Government's belief that New York State's eavesdropping statute nonetheless controls, despite these compelling considerations, is founded upon a misreading of our decision in *United States v. Tortorello,* 480 F.2d 764, 782–83 (2d Cir. 1973), *cert. denied* 414 U.S. 866, 94 S.Ct. 63, 38 L.Ed.2d 86

(1974). There New York State authorities intercepted conversations relating to the acquisition and distribution of fraudulent securities (a federal offense) pursuant to a state eavesdropping warrant authorizing interception of communications relating to the acquisition and distribution of stolen securities. The *Tortorello* panel noted the Government's argument that no authorization subsequent to the original order was required because no state crime specifically dealt with stock fraud. But, it went on to hold that the requirement of further validation was satisfied because of the "notification" given the issuing judge "in the renewal and amendment application papers" submitted after the original authorization that evidence of other, federal crimes had been intercepted. 480 F.2d at 783. *See also United States v. Rizzo,* 492 F.2d 443, 447 (2d Cir.), *cert. denied,* 417 U.S. 944, 94 S.Ct. 3069, 41 L.Ed.2d 665 (1974) (evidence of counterfeiting intercepted pursuant to state wiretap authorization, subsequent approval by reference to renewal papers).[10]

By its holding that the original order was, in effect, amended by reference to renewal application papers, the *Tortorello* panel recognized that the statute's require-

8. Our conclusion that § 2517(5) applies with equal force to electronic surveillance operations conducted pursuant to state court authorization is further buttressed by the language of that section. It applies "[w]hen an investigative or law enforcement officer, while engaged in intercepting wire or oral communications *in the manner authorized herein . . .*" 18 U.S.C. § 2517(5) (emphasis supplied). The principal prosecuting attorneys of states or of their political subdivisions are authorized by 18 U.S.C. § 2516(2) (if further authorized by state statute) to apply to a state court judge of competent jurisdiction for an order approving the interception of communications. Thus we would read "in the manner authorized herein" to include both state court and federal court wiretap orders.

9. No [State] applications may be authorized unless a specific State statute permits it. The State statute *must meet the minimum standards reflected as a whole in the proposed chapter.* The proposed provision envisions that States would be free to adopt more restrictive legislation, or no legislation at all, but not less restrictive legislation.

S.Rep. 1097, *supra, quoted in* 2 U.S.Code Cong. & Adm.News at p. 2187 (1968) (emphasis added). *See also* H.Rep. 488, 90th Cong., 1st Sess. (1967).

10. In the instant case, as in *Tortorello, supra,* the *Assistant District Attorney incorporated* into his affidavit supporting the amendment and renewal of the Heimerle wiretap, the transcripts of five conversations intercepted concerning the scheme to distribute counterfeit money.

Government's Brief, pp. 21–22, in *United States v. Rizzo, supra.* The *Rizzo* panel rejected a § 2517(5) claim on the basis of *Tortorello, supra,* noting that "the facts here are for all intents and purposes identical to those in *Tortorello.*" A similar situation is presented here by the "Lounge order" tap, in its renewal and extension by the state court judge on March 8, 1972, and thereafter. *See* text accompanying note 12, *infra.* By contrast, the record does not disclose that any neutral judge was ever called upon to determine (even by reference) whether the interception made pursuant to the "Delmonico order" relating to federal offenses was incidental and in good faith. *See* footnote 14, *infra.*

ments did have to be met despite the similar nature of the offenses involved.[11] In this fashion, the requisite judicial approval for the incidental interceptions of calls pertaining to the federal offense was obtained, and the statutory requirement thus satisfied.

## IV.

■ Viewing the challenged interceptions in the light of § 2517(5), our inquiry becomes both narrow and relatively straightforward. When an investigative or law enforcement officer engaged in an authorized electronic surveillance operation

> intercepts wire or oral communications relating to offenses *other than those specified* in the order of authorization or approval,

subsequent judicial approval must be obtained before the contents of such communications may be disclosed or used in any criminal or grand jury proceeding. 18 U.S.C. § 2517(5) (emphasis supplied). *See also* 18 U.S.C. § 2517(3), amended in 1970 to encompass disclosure in non-criminal proceedings as well. In this case, the District Attorney of the County of New York was authorized by the February 3, 1972 wiretap order—the "Lounge order"—to intercept communications providing evidence of various state offenses, including grand larceny

by extortion and conspiracy to commit that crime. The fruits of the tap were later used before a federal grand jury conducting an investigation into possible violations of 18 U.S.C. §§ 1951, 371 (interference with interstate commerce by threats or violence, interstate travel and transportation in aid of racketeering). As to the Lounge order and the Marion-Tortora conversation intercepted pursuant thereto, we conclude that § 2517(5) approval was provided in the renewal of that order by a Justice of State Supreme Court on March 8, 1972.[12] We find that the affidavit of Assistant District Attorney Goldstock clearly provided the state judge—who had initially authorized the first Lounge wiretap one month before—with notification that possible federal offenses might be implicated. And we presume, as in *United States v. Tortorello, supra,* that in renewing the tap the judge carefully scrutinized those supporting papers and determined that the statute's requirements had been satisfied.

■ The second ("Delmonico") wiretap order was directed to proof of, *inter alia,* the state crime of illegal possession of dangerous weapons, and was never renewed, extended, or amended. *See* footnote 14, *infra.* But the intercepted communication was used to question Marion before the grand jury about possible violations of the

---

**11.** Its observation in a footnote that *"it may be that amendment was not required by New York law under the circumstances of this case,"* 480 F.2d at 782, n. 16 (emphasis added), was nothing more than an *en passant* comment upon which the Court's holding did not rest. In the same footnote the *Tortorello* panel quoted from a memorandum prepared by the State Commission on Revision of the Penal Law and Criminal Code in 1966 to a predecessor to N.Y. C.P.L. § 700.65(4). The portion excerpted suggested that subsequent judicial approval would be required by that statute if the communication was *"totally unrelated* to the crime for which the warrant was issued." McKinney's 1966 Session Laws of New York, Memorandum 2293, 2296. This view, articulated before the Supreme Court's decisions in *Katz* and *Berger,* may be said to find at least marginal support in the language of § 700.65(4) (referring to "a communication which was not otherwise sought . . . ."). *But see People v. Gnozzo,* 31 N.Y.2d 134, 335 N.Y.S.2d 257, 263, 286 N.E.2d 706, 710 (1972), *cert. denied sub nom.*

*Zorn v. New York,* 410 U.S. 943, 93 S.Ct. 1373, 35 L.Ed.2d 610 (1973). It cannot, in any event, prevail in the face of § 2517(5)'s clear mandate, which we find controlling for the reasons discussed in this opinion.

**12.** We find it incomprehensible and, at the same time, rather disturbing that the Government failed to bring to this Court's attention the fact that the Lounge order was renewed on several occasions. Its brief merely observes that

> The Lounge order was the first of a net of 29 state wiretap warrants the propriety of whose execution—with respect to matters not here at issue—was twice affirmed by this Court. *United States v. Rizzo,* 491 F.2d 215 (2d Cir.), *cert. denied,* 416 U.S. 990, 94 S.Ct. 2399, 40 L.Ed.2d 769 (1974); *United States v. Rizzo,* 492 F.2d 443 (2d Cir.), *cert. denied,* 417 U.S. 944, 94 S.Ct. 3069, 41 L.Ed.2d 665 (1974).

federal statute concerned with the transportation and transfer of an unregistered firearm through interstate commerce, 18 U.S.C. §§ 371, 922.

It is clear beyond all doubt that this federal offense was separate and distinct from the alleged state crime which formed the predicate for the original Delmonico wiretap authorization, and thus falls within the ambit of § 2517(5).[13]  Cf. *United States*

v. *Brodson, supra.*  Because the conversation here in question clearly *did* relate to offenses "other than those specified" in the state court's March 15, 1972 order of authorization, and since the Government failed to obtain the subsequent judicial approval [14] required by § 2517(5) for that interception, Marion's conviction for perjury and the first count of obstruction of justice must be reversed.[15]

---

**13.** We recognize that it might be said in both instances that the communications related to the state crimes named in the wiretap orders. For example, Marion's efforts to influence a corporate vote with his truck-wrecking scheme might have arguably fallen within New York's definition of grand larceny by extortion, or conspiracy to commit that crime. *Cf. People v. Spartarella*, 34 N.Y.2d 157, 356 N.Y.S.2d 566, 313 N.E.2d 38 (1974) (construing "property" for N.Y. extortion statute, Penal Law § 155.-05(2)(3), to include certain intangible rights). We do not find this relevant, however, for the communications also related to the distinct federal offenses later under investigation by the grand jury.

We find ourselves in total disagreement with the conclusion reached by our dissenting brother that the state and federal offenses here at issue were "closely enough related to consider them as the same for the purpose of § 2517(5) . . . ." The differences between possession of a dangerous weapon and the transportation and transfer of an unregistered firearm in interstate commerce, for example, should be readily apparent. *Cf. United States v. Bass*, 404 U.S. 336, 350, 92 S.Ct. 515, 524, 30 L.Ed.2d 488, 498 (1971); *United States v. Bell*, 524 F.2d 202 (2d Cir. 1975). And, in view of our conclusion that approval for the interception of the truck-wrecking call was obtained under the *Tortorello* rationale of implicit authorization, we need not decide whether the state crime of grand larceny by extortion and the federal offense of obstructing or delaying interstate commerce by threats or violence could be considered sufficiently similar to obviate any need for § 2517 approval.

**14.** Section 2517(5) provides that the application "shall be made as soon as practicable." In all events, however, approval of the serendipitous interceptions must be obtained *before* their contents or fruits are used, pursuant to § 2517(3), in any criminal or grand jury proceeding. *See infra* at Part V. The record does not disclose that any application was ever made for such approval in connection with the Delmonico order, or even for its renewal or extension. We cannot agree with our dissenting brother that approval of the Marion-Denero call, intercepted by the Delmonico tap, was provided by the fact that the state court judge

was informed of that call when he renewed the separate wiretap for Jimmy's Lounge. It would stretch the rationale of *Tortorello* beyond all meaning to hold that implicit authorization may be furnished in this fashion. In *Tortorello* the orders, "by referring to the affidavits [supporting renewal and amendment of the *original* order] for a description of offenses and communications to be intercepted, were amended as the contents of the affidavits changed." 480 F.2d at 783. The dissent today seemingly suggests that the Delmonico order was amended by reference to affidavits submitted in support of applications to renew and extend the *Lounge* order, a conclusion we find logically untenable and not in compliance with Title III. The state court judge was not called upon at any time to pass upon the validity of the interception here challenged. To say that the Delmonico order "became merged into" the Lounge order simply because each was directed generally at similar criminal conduct would extend the logic of *Tortorello* past its breaking point.

**15.** We have considered Marion's other claims and find them without merit. And, although the question was not argued by the parties, we do not believe the unauthorized use of the conversations in the federal proceedings was either harmless or waived. While Marion might have invoked 18 U.S.C. § 2515 as a defense had he refused to answer grand jury questions derived from the interceptions, *Gelbard v. United States*, 408 U.S. 41, 92 S.Ct. 2357, 33 L.Ed.2d 179 (1972), he did not do so. *See also* 18 U.S.C. § 3504(a)(1). Under the circumstances of Marion's two grand jury appearances, this may connote ignorance more than conscious and voluntary waiver. In any event, however, he did raise the question of non-compliance with § 2517(5) in a pre-trial motion to dismiss the indictment.

Moreover, but for the two challenged conversations, Marion would not have been called before the grand jury. His testimony before that body, arguably "derived from" those calls, and recordings of the interceptions, constituted the Government's principal evidence in his federal trial for perjury and obstruction of justice. Under these circumstances, his conviction for perjury and the first count of obstruction of justice are irremediably tainted by the § 2517(5) violation.

The dissenting opinion of our brother Anderson suggests that this conclusion "abolishes this Circuit's adoption of the relatively broad definition of closely related state and federal offenses" and in its place "substitutes the test of exactly similar essential elements in both the state and federal crimes." Although the dissent believes our prior decisions "enunciated" the broader definition, it appears to concede in the same breath the ineluctable fact that this precise point has never (before today) been *explicitly* decided by this Court.

In *United States v. Grant*, 462 F.2d 28 (2d Cir. 1972), for example, the appellants argued only that the state statute did not, among the enumerated offenses for which wiretaps could be initially *authorized*, include the conduct there at issue. The *Grant* panel merely ruled that the New York definition of larceny "is sufficiently broad to encompass the conduct involved in this case" for the purposes of N.Y.Crim. Proc.Law §§ 700.10, 700.05(8) (enumerating predicate offenses for wiretap orders).

To say that conduct falls within the broad definition of a state offense is *toto caelo* from saying that the state crime and some similar provision of the federal criminal code were, for the purposes of § 2517, so closely related as to obviate the need for subsequent judicial approval. Resolution of the first question does not provide sufficient basis (contrary to our brother Anderson's suggestion) to infer how the same court might have resolved the second, wholly unrelated issue—particularly when the latter was never raised. As our dissenting brother concedes, the *Grant* panel did *not* reach the question whether the state and federal statutes described different offenses for purposes of § 2517. With all due respect, it may be less than helpful to divine how that court might have decided a question it never faced. Certainly it is somewhat tenuous to characterize the resolution of the § 2517 issue squarely faced for the first time today as being "at odds" with *Grant* on the basis of no more than a guess

derived from the *Grant* panel's holding on quite a different point.

Nor can we agree that the dissent's generous reading of *Grant* finds support in footnote 17 of this Court's decision in *United States v. Tortorello, supra,* 480 F.2d at 783. The citation of *Grant* was directed merely to whether federal securities laws violations might be "encompassed" within the state crime of larceny. It did *not* cite *Grant* on the "specific point" that "the supporting affidavits made clear the specific crimes being investigated," as our brother Anderson suggests. As already noted, and as Judge Anderson agrees, the *Tortorello* panel *held* that the subsequent approval requirement had been satisfied by the procedures observed (amendment by reference to affidavits). Clearly if the *Tortorello* court had accepted the Government's alternative argument that "there was no need to amend the provisions of the order," such a holding, clearly denominated as such, would have been unnecessary. The support which our dissenting brother seems to derive from *Tortorello* is totally ephemeral, and certainly fails to contradict our conclusion today.

Thus apart from *Tortorello* and *United States v. Rizzo, see* footnote 10, *supra,* where the requirement of subsequent judicial approval was held to have been satisfied, no prior decision of this court has ever considered the § 2517 question. And no holding of this or any other court interpreting Title III has been drawn to our attention that might be said to be inconsistent with the conclusion of this opinion that subsequent judicial approval is required where the intercepted communication relates to "offenses other than those specified" in the initial wiretap order.

In urging a contrary result, the Government in its brief decries the "literalism" in construing § 2517(5) which recently prompted two federal courts, in analogous situations, to dismiss indictments for failure to comply with that section. *See United States v. Brodson, supra; United States v. Campagnuolo,* 168 U.S.App.D.C. 227 (S.D. Fla., Dec. 31, 1975). *But cf. United States*

v. Moore, 513 F.2d 485, 500–03 (1975) (interpreting the local District of Columbia analogue to Title III). While § 2517(5) requires subsequent validation before use in a criminal or grand jury proceeding of intercepted communications "relating to offenses other than those specified in the order of authorization", the Government urges that this language be read to require judicial approval only where the communication is "totally unrelated" to the previously specified offense.[16]

We recognize that the so-called "plain-meaning rule" of statutory construction has fallen upon justifiably hard times. See, e. g., Murphy, Old Maxims Never Die, 75 Colum.L.Rev. 1299 (1975). But where both the words of the statute and the clearly expressed intent of its drafters point inescapably to the same conclusion, we must decline to redraft the legislative enactment simply to avoid speculative adverse consequences that might flow from its proper construction.

Mr. Justice Clark, writing for a unanimous panel of the Seventh Circuit, rejected a similar argument in United States v. Brodson, supra. There it was contended that because the intercepted conversations "related to" both the federal gambling offense named in the order authorizing the wiretap and to the slightly different federal gambling offense for which Brodson was indicted, further court approval was unnecessary. The Brodson panel noted that the two offenses involved dissimilar elements and required different evidence, "even though some of it might overlap because both concern illegal gambling." 528 F.2d at 216. The opinion went on to hold, however, that the controlling factor was not the dissimilarity of the offenses, "but the fact that the Government itself has violated the key

provision of the legislative scheme of Section 2515, in that it did not comply with the mandate of Section 2517(5)." We agree, moreover, with its conclusion that

> Any exceptions from [the] broad language [of § 2515] must be strictly construed in order to carry out the purpose of the Congress and make certain that the privacy of the individual is protected as so provided.[17]

Strict compliance with the requirements of § 2517(5) and the other strictures imposed by Title III is no less essential. See United States v. Capra, 501 F.2d 267, 276 (2d Cir. 1974). Congress carefully circumscribed utilization of the occasionally useful but potentially dangerous law enforcement tools of electronic surveillance in an effort to comply with the Fourth Amendment and to "protect effectively the privacy of wire and oral communications [and] the integrity of court and administrative proceedings." Pub.L. 90–351, Title III, § 801. To ignore or gloss over these restrictions, or view them as mere technicalities to be read in such a fashion as to render them nugatory, then, is to place in peril our cherished personal liberties.[18]

## V.

The practical consequences of our decision are far less substantial than those suggested by the parties to this appeal. Where an otherwise valid electronic surveillance operation intercepts communications "relating to offenses other than those specified" in the original order of authorization—whether or not they also relate to the specified crimes—application must be made as soon as practicable to a judge of competent jurisdiction before those communications or their fruits can be used in a criminal, grand

16. See, e. g., Government's Brief at 11–12, n. **. Compare 18 U.S.C. § 2518(5), requiring that surveillance operations "be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter . . .."

17. "Section 2515 is thus central to the legislative scheme. Its importance as a protection for 'the victim of an unlawful invasion of privacy'

could not be more clear." Gelbard v. United States, 408 U.S. 41, 50, 92 S.Ct. 2357, 2362, 33 L.Ed.2d 179, 188 (1972).

18. See, e. g., United States v. Giordano, 469 F.2d 522, 530 (4th Cir. 1972), affirmed, 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974); United States v. Narducci, 341 F.Supp. 1107, 1115 (E.D.Pa.1972), affirmed, 500 F.2d 1401 (3d Cir. 1974).

jury, or other proceeding, 18 U.S.C. § 2517(5). The frequency with which wiretap applications are routinely granted suggests that this result will neither cripple the Government's efforts to engage in electronic surveillance, nor tie its hands in the fight against crime.[19]

Nor do we believe, contrary to the concern expressed in Judge Anderson's opinion, that this interpretation will "probably enlarge the scope of the suppression hearings . . . ." Suppression hearings are now being conducted routinely where wiretap derived evidence is to be introduced, and mere inquiry whether the minimal requirements of § 2517 have also been satisfied will not add to the judge's burdens. It is, in any event, a condition Congress has deliberately chosen to impose as a protective procedure in "creating an investigative mechanism which potentially threatened the constitutional right to privacy . . . ." *United States v. Capra,* 501 F.2d 267, 276–77 (2d Cir. 1974).

Finally, our holding does not "call into question" the practice of joint federal-state wiretap investigations. Indeed, Title III's framers seem to have specifically envisioned cooperation among law enforcement authorities of different jurisdictions where appropriate to enhance the effectiveness of electronic surveillance operations. *See, e.*

*g.,* 18 U.S.C. § 2517(1), (2). If, for example, federal officials called into an ongoing state wiretap operation learned at that time of communications relating to separate federal offenses not specified in the initial interception order, there would be little difficulty in obtaining the requisite subsequent approval pursuant to § 2517. And where federal and state officers pursue an investigation jointly from its inception, we foresee little difficulty for the appropriate federal officer to obtain a separate order authorizing the interception of communications relating to the federal offenses believed involved.[20]

■ Where a state wiretap discloses evidence of possible federal offenses, as here, we would read the "as soon as practicable" language of the section in a common-sense fashion. That is, if federal authorities are to use in federal proceedings the intercepted communications or evidence derived therefrom, approval must be secured "as soon as practicable" after they learn (or should reasonably have learned) of the relevant contents of those communications. In all events, however, the judge must make his finding, explicitly or otherwise, that the contents were "otherwise intercepted in accordance with the provisions of [Title III]" *before* any use or disclosure thereof in criminal, grand jury, or other proceedings. 18 U.S.C. § 2517(5), (3).[21]

**19.** In the calendar year 1974, for example, 99.67% of all applications to intercept wire or oral communications made to state courts, and 100% of such applications to federal judges, were granted. Similarly, during the same period, 356 of 358 applications for extension or renewal of interception orders were granted. Administrative Office of the United States Courts, *Report on Applications for Orders Authorizing or Approving the Interception of Wire or Oral Communications, Jan. 1, 1974—Dec. 31, 1974,* at III, IV.

**20.** While to some such a *pas de deux,* i. e., of requiring separate state and federal orders, may appear cumbersome or duplicative, it is the necessary result of a statutory schema which restricts federal and state wiretaps, in the first instance, to enumerated federal and state offenses respectively. *See, e. g.,* 18 U.S.C. § 2516; N.Y.Crim.Proc.Law §§ 700.10, 700.05(8). Inasmuch as the interception of communications relating to different federal offenses would not, under those circumstances,

be incidental, it would be neither unduly onerous nor inappropriate under Title III to secure separate prior judicial authorizations. Certainly it would not destroy flexibility in joint investigations, nor deter their utilization in proper cases.

**21.** By our conclusion that subsequent approval was conferred by the state judge's renewal of the Lounge order, *see* note 12 and accompanying text, *supra,* we recognize that such approval need not be accompanied by an explicit finding enunciated on the record of compliance with Title III. *See, e. g., United States v. Tortorello, supra,* 480 F.2d at 783; *United States v. Rizzo, supra,* 492 F.2d at 447. We note, however, that such implicit authorization procedures are susceptible to possible uncertainty as they are reviewed for their consonance with § 2517(5).

We would hope, therefore, in view of the clear dictates of our ruling in this case, that in the future law enforcement officials will as a

We do not, however, read Title III to restrict (as urged by appellant at oral argument) the grant of subsequent judicial approval in that context solely to federal judges. Situations can be readily envisaged wherein the state judge who initially authorized the wiretap would be in a far better position to gauge the bona fides of the original application and the incidental nature of the interception of conversations concerning possible federal offenses. Nor does the statute itself draw such a fine distinction among judges "of competent jurisdiction." *See* 18 U.S.C. § 2510(9).[22]

The Government here failed to secure subsequent judicial approval, whether from a state or federal judge, at any time before the Marion-Denero conversation concerning the delivery of an "unregistered thing" was used in the federal grand jury proceedings and Marion's trial. In view of this failure to comply with § 2517(5), his conviction for perjury and one count of obstruction of justice, which were derived from that conversation, cannot stand.

Because we conclude, however, that the interception of the conversation in which the truck-wrecking scheme was discussed was properly validated by the State court judge upon renewal and extension of the "Lounge order", we affirm Marion's conviction on the second count of obstruction of justice.

Affirmed as to Count 3, reversed as to Counts 1 and 2.

ANDERSON, Circuit Judge (concurring in part and dissenting in part):

I concur in the majority opinion insofar as it affirms the conviction of Marion on count three of the indictment, but I respectfully dissent from the reversal of Marion's

convictions on counts one and two which charged him, respectively, with perjury because he gave such inconsistent answers to the grand jury, while testifying under a grant of use immunity, about his purpose in acquiring a pistol that one of the answers was manifestly false; and with obstructing justice by giving false and evasive testimony.

The essential part of the evidence upon which proof of these charges rested was obtained through warrants to tap telephone conversations of Marion and others, issued by a New York state court "judge of competent jurisdiction." The evidence was presented to a federal grand jury pursuant to 18 U.S.C. § 2517. The appellant claims that the use of this evidence by the federal prosecuting authorities was improper because the requisites of § 2517 had not been fully or correctly complied with. He, therefore, moved to dismiss the perjury and the obstructing and impeding of justice charges against him. The district court denied his motion. Marion was convicted and has appealed the judgments against him.

That portion of the majority opinion which deals with counts one and two above mentioned, completely reverses the interpretation and application of § 2517(5) as they have been enunciated by this court for the past several years. It does so without discussion of its intended effect upon recent decisions of the court, pending cases and presently sought indictments. Nor does it say what precedential value is left, if any, after its holding and discussion of counts one and two, to this Circuit's decisions in the area although these former decisions form the basis for its holding on count three. Where there has been close similari-

---

matter of prudence seek to secure explicit approval of such incidental interceptions. Such efforts should not be unduly burdensome, *see* note 19, *supra*, particularly where the issuing judge has been made aware of the results of the surveillance operation while it is still in progress.

**22.** As used in this chapter—

. . . (9) "Judge of competent jurisdiction" means—

    (a) a judge of a United States district court or a United States court of appeals; *and*

    (b) a judge of any court of general criminal jurisdiction of a State who is authorized by a statute of that State to enter orders authorizing interceptions of wire or oral communications . . . ..

18 U.S.C. § 2510(9) (emphasis added). *See also United States v. Tortorello, supra,* 480 F.2d at 782–83.

ty, identity and relationship between a state crime, for which a telephonic tap has been authorized and a warrant issued, and a federal crime of which evidence is necessarily disclosed during the state tap, the approval by "a judge of competent jurisdiction" for the use of such evidence by a federal prosecutor before a federal grand jury, has not been required because it was so nearly identical or akin to the related state offense that it actually was not an offense "other than that specified in the order" and it was not necessary under the applicable state law as it applied to state taps. In the present case the criminal conduct on which the state and federal charges were based was the same, and it was performed by the same individuals, one of whom was the appellant Marion.

The majority, with perhaps some justification, feels that this practice does not adhere with sufficient strictness to the protective purpose of § 2517(5) and might encourage a rather freewheeling means of bypassing judicial scrutiny and approval. On the other hand, there is an advantage, particularly in joint state and federal coordinated and cooperative efforts in pursuit of racketeering and organized crime, to retain the flexibility of the present procedure. Furthermore, a sufficiently stringent line can be drawn by the outer boundary of this court's decisions, which can be constricted further in succeeding cases as the court may decide to be necessary.

On December 15, 1975, the Seventh Circuit decided *United States v. Brodson,* 528 F.2d 214 (7 Cir. 1975), which held that the approval of a "judge of competent jurisdiction" was absolutely necessary to authorize the Government to present to a federal grand jury, evidence of a violation of 18 U.S.C. § 1084, for which no such approval had been obtained, even though exactly the same evidence had been gained from an authorized tap on an intercepted conversation which related to a Title 18, § 1955 violation. Both §§ 1084 and 1955 were overlapping statutes covering illegal gambling. The court held that the two offenses

"were separate and distinct" and that evidence properly obtained and authorized through a tap which bears on a particular offense can only be used to indict for another offense where the essential elements of the latter are exactly the same as those of the former—which doesn't occur very often.

The present majority opinion abolishes this Circuit's adoption of the relatively broad definition of closely related state and federal offenses and like criminal conduct, as obviating the necessity for obtaining the approval of a "judge of competent jurisdiction" before presenting the state-tap acquired evidence to a federal grand jury. In its place it substitutes the test of exactly similar essential elements in both the state and federal crimes as the prerequisite to the authority of the United States attorney to present the evidence to the federal grand jury without the prior approval of a judge.

In the following discussion I shall take up the effect of the new, stricter standard set forth in the majority opinion, as it relates to counts one and two, upon several of the decisions of this court which have shaped the current rule of the Second Circuit.

Section 2517(5) requires any federal or state agent, acting as a witness, in a federal court to obtain judicial approval before so testifying, e. g., in grand jury proceedings, about the contents of intercepted "communications relating to offenses *other than those specified* in the [initial] order of authorization or approval . . . " (emphasis supplied). It is clear from numerous previous cases dealing with challenges to wiretap evidence under Title III that federal authorities have not believed it necessary to obtain such subsequent approval when seeking indictments for criminal conduct which is basically similar or closely related to that constituting the state crimes at which state-authorized wiretaps were directed or which have arisen out of substantially the same acts—despite the fact that the federally-defined offenses may involve certain additional elements, such as jurisdictional facts, or require some additional proofs. This court's previous decisions

have, generally speaking, enunciated that interpretation of § 2517(5).[1]

In *United States v. Grant,* 462 F.2d 28 (2 Cir. 1972), for instance, the court allowed the results of state wiretapping, which had been authorized for the obtaining of evidence relating to specified state crimes, to be used in the prosecution of the defendants for federal crimes including securities fraud, on the ground that the definition of "larceny," a crime with respect to which the state wiretapping statute permitted interception, "is sufficiently broad to encompass the *conduct* involved in this case." (Emphasis supplied.) 462 F.2d at 33. While § 2517(5) is not specifically mentioned in the *Grant* opinion, our later decision in *United States v. Tortorello,* 480 F.2d 764 (2 Cir. 1973), *cert. denied,* 414 U.S. 866, 94 S.Ct. 63, 38 L.Ed.2d 86 (1974), cites this holding directly on the question of when subsequent judicial approval is required by § 2517(5) (or by the New York statute which is "substantially identical" to it, *id.* at 782). *Tortorello* involved an appeal from convictions for federal offenses involving, *inter alia,* securities fraud, following a trial at which testimony of conversations, heard

as a result of *state*-authorized wiretaps, had been admitted into evidence. The orders authorizing those wiretaps had been sought in the investigation of state crimes involving stolen property and forged instruments, including more particularly grand larceny, and the defendant argued that they had not been properly amended[2] "to include reference to the securities fraud offenses for which he was indicted by a federal grand jury," *id.* at 781. Although the court held that the procedures followed in the state court had in fact amounted to the requisite amendment, it also expressed agreement with the Government's contention that no amendment was *needed* because the crime of grand larceny encompassed stock fraud and the supporting affidavits made clear the specific crimes being investigated. *Id.* at 782–83. The court cited *Grant* on this specific point. *Id.* at 783 n. 17. Obviously, the strict interpretation of "other" offenses announced in the present majority opinion is at odds with these cases.

The majority opinion also calls into question another law enforcement practice which has been approved by this court on

---

1. *See also United States v. Moore,* 168 U.S. App.D.C. 227, 513 F.2d 485, 500–503 (1975), which involves the application of a District of Columbia Code provision governing wiretaps whose relevant language is identical to that of 18 U.S.C. § 2517(5). In that case, evidence obtained from wiretaps which had been authorized for the interception of evidence relating to District of Columbia gambling offenses had been disclosed to federal agents and used to provide "a foundation for prosecution" of *federal* gambling offenses which involved additional essential elements. (As distinct from § 2517(5), which requires judicial approval only where the intercepted evidence is to be presented in testimony under oath, the stricter D. C. provision requires approval even where, as in *Moore,* the evidence is merely disclosed to federal agents who in turn use it to obtain search and arrest warrants. 513 F.2d at 501 n. 48.) The Court of Appeals rejected the defendant's contention that judicial approval was required in order to use the wiretap results in aid of the federal prosecution, because it did not "believe that there was any interception 'relating * * * to offenses other than those specified in the order of authorization' within the meaning of [the D. C. wiretap law]." 513 F.2d at 501 (ellipsis in original). In the court's view, since the intercepted communications did

relate to the specified D. C. gambling offenses, it was immaterial that they also "constituted evidence of federal offenses." *Id.* at 502.

The court went on to state that even if it were to hold otherwise on the issue of whether the interception related "to offenses other than those specified in the order of authorization," it would nonetheless hold that the requirement of judicial approval had been met, because in the original orders themselves the issuing judge had authorized disclosure of the intercepted evidence to federal agents. While the majority in the present case would doubtless be inclined to seize on this alternative ground of decision in order to dismiss the former ground as "mere dictum," I believe *Moore* must be viewed as directly in conflict with the rule laid down by the majority today.

2. Where unanticipated evidence of crimes different from those specified in the original order authorizing electronic interception is overheard, *amendment* of the order to include the unanticipated crimes is the procedural mechanism established by New York statute for effectuating the subsequent judicial *approval* required by § 2517(5). N.Y.Crim.Proc.Law § 700.65.

more than one occasion, namely the use of joint federal-state wiretap investigations pursuant to a state warrant. In *United States v. Manfredi,* 488 F.2d 588 (2 Cir. 1973), *cert. denied,* 417 U.S. 936, 94 S.Ct. 2651, 41 L.Ed.2d 240 (1974), to take one example, we affirmed the defendants' convictions for federal narcotics offenses where evidence had been gathered through the use of state-authorized telephone interception in which a federal agent played a cooperative role from the outset.[3] It is true that no claim was raised in *Manfredi* that § 2517(5) required subsequent judicial approval of the interception, but under the rules laid down in the present *Marion* majority opinion it does not appear that the evidence would have been admissible even if such approval *had* been sought. Both the majority opinion and the Seventh Circuit opinion which the majority cites with approval, *United States v. Brodson, supra,* state that the granting of subsequent approval to use the contents of communications relating to offenses other than those specified in the original authorization is conditioned on a finding that the interception of such communications was *inadvertent.* Majority opinion at 700–701; *Brodson, supra,* 528 F.2d at 216. But clearly this condition cannot be met when a federal agent joins a state-authorized wiretapping investigation with the specific purpose of gathering evidence of federal crimes. Under the majority's rule, subsequent approval must be obtained even if the communications and the conduct referred to therein simultaneously relate to or constitute both the specified state crimes and the (unspecified) federal crimes. Unless, therefore, inadvertence is stricken from the considerations which the subsequent-approving court must address in such circumstances, the state-federal cooperation approved by this court in such cases as *Manfredi,* will be impossible without securing *both* federal and state court authorizations in advance.

In view of the extensive changes which the majority decision will bring about in the application of § 2517(5) and the problems which will arise in connection with past decisions of this court and with pending indictments, as mentioned above, I have elected to consider the appeal from the denial of Marion's motion to dismiss as it relates to § 2517(5) in the light of the past decisions of this court.

The state offense described in the original warrant was unlawful possession of dangerous weapons (firearms) and the federal offense on which Marion was interrogated before the grand jury, was unlawful transportation of a firearm in interstate commerce. It is my opinion that these offenses were closely enough related to consider them as the same for the purpose of § 2517(5), so that the federal crime was not required to be treated as one of "[the] offenses other than those specified in the order of authorization or approval." The state and federal charges, arising out of the Delmonico order, both rested upon exactly the same body of evidence and the crimes were perpetrated by exactly the same individuals. But it makes no difference whatever, in the present posture of this case, whether the state and federal offenses were the same, or that they were unrelated because the Delmonico order was "reviewed," "extended" and approved, within the standard set out in *Tortorello,* by Justice Birns of the Supreme Court of New York, the justice who issued the Delmonico warrant in the first place. I, therefore, disagree with the majority's conclusion that:

> "Because the conversation here in question clearly *did* relate to offenses 'other than those specified' in the state court's March 15, 1972 order of authorization, and since the Government failed to obtain the subsequent judicial approval required by § 2517(5) for that interception, Marion's conviction for perjury and the first count of obstruction of justice must be reversed." (Footnotes omitted.)

It has failed to give consideration to the fact that the federal investigation which

---

**3.** The state warrant authorized interception of conversations concerning various enumerated *state* drug offenses, and indeed under the appli-

cable New York statute a state court may authorize wiretapping *only* with respect to state offenses. See N.Y.Crim.Proc.Law § 700.05(8).

provided the evidence used at the subsequent grand jury proceedings, brought into question by the appellant, was a cooperative effort between federal and state authorities to bring to book an organized group of criminals who had been carrying on illicit activities in the New York area, reaching out to the far-western states. These efforts were directed at the same suspected individuals and concerned the same kinds of offenses, including the crimes of extortion and transportation of firearms in interstate commerce, which were specifically under investigation in the prelude to this case. It was an on-going investigation which continued over a period of several months. This required repeated applications for consecutive warrants to comply with Title 18 U.S.C. § 2518(5). The Delmonico order was issued on March 15, 1972, on Goldstock's affidavit, to tap telephone 355–2500, Exts. 706 and 707 at Delmonico's Hotel to seek evidence of several crimes including *possession of dangerous weapons*. The named principals were Rizzo, Tortora and Marion.

On April 7, 1972 Justice Birns issued a warrant on the affidavit of Goldstock, which recited the history of the first warrant of February 3, 1972 authorizing the tap on "Jimmy's Lounge" (the Lounge Order); the consecutive order issued on March 8, 1972 by Justice Birns; and the supplemental and amending Lounge warrant issued March 18, 1972 by Justice Murtagh, allowing, *inter alia*, bugging the back room at Jimmy's Lounge. The supporting affidavit recites the past Lounge orders and the Demonico order which was issued by Justice Birns on March 15, 1972. It also tells of the result of the Delmonico tap, effected on March 16, 1972, and the conversation disclosing the transportation by air, New York to Las Vegas, of the unregistered firearm. It mentioned the necessity for continued electronic surveillance and the cooperative efforts in the investigation by the New York County District Attorney's office and the F.B.I.

While Marion was not mentioned as a principal in the first Lounge order (February 3, 1972) he was mentioned in the second

(March 8, 1972) in connection with the extortion and other charges, including possession of dangerous weapons. In the third Lounge order, dated March 18, 1972 (an amendment to the order of March 8 1972), reference was made to the "Delmonico" or "Hotel order" and Marion was named as a person whose communications were to be intercepted. The fourth Lounge order, issued April 5, 1972, names Rizzo, Tortora and Marion as the principals in that warrant, and one of the offenses listed was (as in Delmonico), the possession of a dangerous weapon. The fourth Lounge warrant allowed the tapping of telephone numbers 228–9834 and 475–9818 at Jimmy's Lounge, which differed from the Delmonico Hotel numbers, made available under the Delmonico order.

The April 7, 1972 order, which covered, *inter alia,* the same offense of possession of dangerous weapons as did the Lounge and Delmonico orders and which named exactly the same three principals, was clearly "an extension and approval" of the Delmonico order which became merged into the April 7th order, and which was made to apply to the telephone numbers at Jimmy's Lounge. This April 7th warrant was "renewed," "extended" and thereby approved by Justice Birns when he issued the consecutive Lounge order on May 5, 1972. The Goldstock affidavit in support of this succeeding warrant again recited the histories of the Lounge and Delmonico orders and named the same three principals.

There can be no doubt that these progressive steps in the history of this investigation with warrants issued at least every 30 days, by statutory mandate, twice "renewed", "extended" and approved the Delmonico order, as specified in *Tortorello* and *Rizzo.*

It is apparent that the investigators had concluded, around the middle of March, 1972, that either the suspects (Rizzo, Tortora and Marion) were using the tap-authorized telephones at Jimmy's Lounge less, or were using a telephone elsewhere. At any rate, the tap warrant for the Delmonico Hotel, issued on March 15, was for tele-

phone 355–2500, Exts. 706 and 707, and it terminated on March 29, 1972. It was used on March 16th and conversations in which Marion participated were heard. On March 18th the warrant to bug the back room of Jimmy's Lounge was issued by Justice Murtagh. By April 7, 1972 the investigators procured an order from Justice Birns authorizing the interception of conversations on the regular telephones at the Lounge, previously tapped. The main line of wiretap interceptions in this investigation involved the Lounge telephones numbers 228–9834 and 457–9818, both before and after the Delmonico order. The Delmonico order means no more than that for a short period the suspects were found to be using telephones 355–2500, Exts. 706 and 707 at the Delmonico Hotel. The warrants authorized taps on the conversations of the *same three* principals, concerning exactly the *same crimes,* in Delmonico as in the Lounge taps preceding and following Delmonico. The consecutive, integrated orders form an unmistakably clear pattern covering a single investigation of the same criminal activities of the same three suspects. The Delmonico order was part and parcel of it and was in no sense a completely detached episode having no relationship to the Lounge orders. The sole reason for it was that a new non-renewal order had to issue to cover the newly discovered telephone numbers. It plainly merged with the Lounge line of authorized interception orders and was reviewed and approved by the Lounge orders of April 7th and May 8, 1972, by Justice Birns, as the supporting affidavits for these two orders show.

The Delmonico tap was necessitated by the fact that the suspects were discovered using a telephone different from the telephones previously used by them, which were tapped several times in the course of the investigation of these same individuals relative to the same offenses. To hold that such a tap order cannot be reviewed and approved by the same judge in the course of issuing a subsequent order for interception of conversations, of the same suspects for the same offenses, over the telephone more

customarily used by them and that, therefore, all evidence procured from the special tap order is unlawful, and that its use before the indicting grand jury calls for the dismissal of the indictment and the release of the accused, is somewhat bizarre, to say the least. Inasmuch as a wire tap warrant can remain operative for only 30 days, it was necessary in this case to apply, at succeeding times for a total of 29 warrants. For this reason also the investigation could not be completed through amendments to the original warrants. But this fact in no way detracts from the issuing judge's ability to review and approve the evidence received under a just expired warrant.

There are advantages and disadvantages to each of the strict and broad interpretations of § 2517(5). The former are well set out in the majority opinion. The strict approach is more definite and precise, and, by making mandatory a judicial review and approval of practically every tap and its actual operation and resulting fruits it may forfend against claims of error in the process itself. On the other hand, as in most cases where strict adherence to a mandatory course of conduct is required, a minor lapse or slightly inadequate fulfillment of the prescribed routine or a technical error may serve to invalidate a conviction based otherwise on overwhelming evidence of guilt. It will, however, probably enlarge the scope of the suppression hearings, now sought in nearly all wiretap cases, by affording defense counsel an opportunity to probe into the actions of the state or federal judges at every occasion of review and approval pursuant to § 2517(5), and will thereby increase the burden of the already over-burdened trial judges. There are ancillary problems which may arise in authorized taps which produce less than all of the required building blocks (essential elements) of an offense, for example, whether or not the state or federal agent has been in pursuit of the correct elements or irrelevant elements. The agent, state or federal, at the same time may have to discontinue the tap every so often, after chalking up only one or two essential elements out of five or

six, in obedience to the minimization mandate, Title 18 U.S.C. § 2518(5).

The broader interpretation of this Circuit is, of course, less automatic and precise and leaves much to the judgment of the trier of the case. It is more flexible and, in my opinion, much better adapted to federal-state cooperation and joint action. It requires care and restraint in finding close relationship and similarity between like state and federal offenses. The broad concept should not be so liberally exercised that the close relationship of the relevant state and federal statutes is not plainly apparent on their faces, and the initial warrant, pursuant to which the tap is made, should be sufficient to include criminal conduct described in both the state and federal statutes. If there is doubt as to the similarity or close relationship, further review and approval by "a judge of competent jurisdiction" should be obtained.

The district court applied the law of this Circuit, as stated in *Tortorello, supra,* and *Rizzo, supra,* at the time it entered the judgments of conviction. There is much that can be said in favor of some modification of the applicable law in the direction indicated by the majority opinion but it should be applied prospectively only; and the change should be considered by the active members of the court.

Judge Conner was, in my opinion, correct in denying the motion to suppress the evidence on all counts and all of the judgments of conviction should be affirmed.