**UNITED STATES of America,**

v.

**Sheldon LEVINE, Defendant.**

**No. 86 CR 304.**

United States District Court,
E.D. New York.

April 12, 1988.

Andrew J. Maloney, U.S. Atty., Brooklyn, N.Y., Edward A. McDonald, Attorney-in-Charge Organized Crime Strike Force (Christopher Ulrich, Sp. Atty., Raymond

Jermyn, Sp. Asst. U.S. Atty., of counsel), Brooklyn, N.Y., for U.S.

Stroock & Stroock & Lavan (Thomas P. Puccio, Joel Cohen, Daniel Turbow, Joann Crispi, of counsel), New York City, for defendant.

## MEMORANDUM AND ORDER

NICKERSON, District Judge.

Defendant Sheldon Levine, indicted on eight counts, moves to suppress evidence obtained by electronic surveillance and statements by him to law enforcement officials. The indictment charges him with (1) obstruction of justice by destroying business records, 18 U.S.C. § 1503; (2) conspiracy to violate the federal tax laws by attempting to evade excise taxes on the sale of gasoline, failing to collect and pay excise taxes, and aiding and advising one Herman DeJonge to prepare false excise tax returns, 18 U.S.C. § 371; and (3) aid, inducement, and advice to DeJonge to (a) attempt to evade payment of excise taxes, (b) fail to account for and pay excise taxes, and (c) prepare and present false excise tax returns. 26 U.S.C. §§ 7201, 7202, 7206(2).

## I. BACKGROUND

The evidence at issue stems chiefly from an August 2, 1985 eavesdropping order of Suffolk County Judge Kenneth Rohl, issued on application of the New York State Attorney General. The order authorized state and federal officials to intercept at Levine's office in Melville, Suffolk County, New York, oral communications by him and certain others as those communications concerned New York State crimes of Grand Larceny in the Second and Third Degrees, N.Y. Penal Law (Penal Law) §§ 155.35, 155.30, Falsifying Business Records in the First Degree, Penal Law § 175.10, and Conspiracy to commit such crimes, Penal Law § 105.05. Theft of state sales and excise taxes constitutes grand larceny under the Penal Law.

Judge Rohl signed various extensions of the surveillance order on August 29, September 30, October 25, November 22 and December 20, 1985. In those extensions he authorized the interception of communications relating to the crime of Offering a False Instrument for Filing, Penal Law § 175.35. Interceptions ended on January 10, 1986.

The affidavits submitted to Judge Rohl on the application for the original order described the nature and extent of the investigation. Participating were some twenty full-time investigators from the offices of the State Attorney General, the Nassau and Suffolk County District Attorneys, the State Department of Taxation and Finance, the Nassau and Suffolk County Police Departments, the United States Attorney for the Eastern District of New York, the Organized Crime Strike Force for that district, the Federal Bureau of Investigation, and the Internal Revenue Service.

The affidavits asserted that there was cause to believe that for at least five years some twenty unscrupulous gasoline distributors, together with members of the Colombo, Luchese, and Genovese crime families, had engaged in a widespread, well-organized scheme to evade payment of any excise taxes imposed on motor fuel products. Since the objective of the scheme was to pay no tax on the sale of gasoline and since the methods to be employed to obtain that objective made no material distinction based on the governmental body imposing the tax, it was obvious that, although the investigation was designed to obtain evidence to prosecute for the state crime of grand larceny by stealing state taxes, the investigators had every reason to believe, indeed they avowed, that the intercepted conversations would also pertain to the theft of federal as well as state and local taxes.

On November 8, 1985, on the application both of the State Attorney General and of a federal prosecutor from the Federal Organized Crime Strike Force, Judge Rohl amended the eavesdropping warrant to permit the use and disclosure in any United States court or grand jury proceeding of intercepted communications relating to various federal crimes, including those now charged in the indictment. The order also permitted use and disclosure of testimony

concerning those communications and evidence derived from them. Judge Rohl found that the application for the amendment had been made as soon as practicable.

Based on evidence obtained from the intercepted conversations, Judge Rohl issued, on February 11, 1986, warrants authorizing searches of Levine's office, home and several other locations. Agents conducted the searches the next day.

## II. ALLEGED SUBTERFUGE EAVESDROPPING IN VIOLATION OF 18 U.S.C. § 2517(5) AND NEW YORK CRIMINAL PROCEDURE LAW § 700.65(4)

Levine asks the court to suppress all evidence obtained pursuant to Judge Rohl's orders on the ground that the officials used the state authorizations as a subterfuge impermissibly to get evidence of federal tax violations for which they could obtain no order independently.

The pertinent federal statutory language appears in Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2510 *et seq.* (the Federal Act), passed by Congress "to define on a uniform basis the circumstances and conditions under which the interception of wire or oral communications may be authorized." S.Rep. No. 1097, 90th Cong., 2d Sess., *reprinted in* 1968 U.S.Code Cong. and Admin.News 2112, 2177. That legislation permits the interception and disclosure of wire communications by wire-tapping, and of oral communications by electronic surveillance or "bugging," where the communications may provide evidence of specified crimes. Unless the detailed procedures of the statute (and of any state provisions, if applicable) have been complied with, no such communication, or evidence derived from it, may be received in evidence in any federal or state proceeding. 18 U.S.C. § 2515.

Under 18 U.S.C. § 2516(1) certain federal officials may apply to a federal judge for an order approving wiretapping or electronic surveillance to seek evidence of specified federal crimes. Federal tax crimes, such as those charged in the present indictment, are not among those specified in the section.

Similarly under 18 U.S.C. § 2516(2) certain state prosecuting attorneys authorized by state statute may apply to a state court for an order to seek evidence of specified state felonies including crimes "dangerous to life, limb or property." New York State adopted N.Y. Criminal Procedure Law (C.P.L.) § 700.05(8), authorizing eavesdropping in connection with the state crimes of grand larceny and falsifying records, the subject crimes stated in Judge Rohl's orders.

Under the Federal Act intercepted communications "relating to offenses other than those specified in the order of authorization" may be disclosed and used pursuant to the official duties of law enforcement officials. 18 U.S.C. § 2517(1), (2), (5). However, any such communications, and evidence derived from them, may be admitted in a federal proceeding only if, "on subsequent application" made "as soon as practicable," a judge of competent jurisdiction "authorize[s] or approve[s]" and finds that the communications have "otherwise" been intercepted in accordance with the federal legislation. 18 U.S.C. § 2517(3), (5).

According to the legislative history, these provisions permit the use in evidence of communications "otherwise intercepted" whether or not they pertain to "designated 'offenses'" that themselves would support a surveillance order. 1968 U.S.Code Cong. and Admin.News, *supra,* at 2189; *see, e.g., United States v. Aloi,* 449 F.Supp. 698, 716–17 (E.D.N.Y.1977).

C.P.L. § 700.65 contains provisions similar but not identical to those in the federal legislation and recites, in substance, that when the state officials intercept "a communication which was not otherwise sought and which constitutes evidence of any crime," the communication and the evidence derived from it may be disclosed by a witness in a criminal proceeding, if a state justice finds that the communication was "otherwise intercepted" in accordance with the state law and amends the warrant accordingly. The application for the amend-

ment must be made "as soon as practicable." C.P.L. § 700.65(4).

In requiring judicial approval before allowing interception of communications "relating to offenses other than" those specified in the initial authorization, Congress sought to preclude "subterfuge" searches. Thus where intercepted communications pertain to crimes for which an order was not or could not be obtained, the judge must determine that the original order was sought in "good faith" and that the communications were "in fact incidentally intercepted" during the course of a lawfully executed order. 1968 U.S.Code Cong. and Admin.News, *supra*, at 2189. *See United States v. Marion*, 535 F.2d 697, 700 (2d Cir.1976); *United States v. McKinnon*, 721 F.2d 19, 22 (1st Cir.1983).

Levine argues that the officials did not undertake the surveillance to obtain evidence of state crimes but employed a subterfuge to search for federal tax violations which themselves would not support an initial surveillance order.

As the officials informed Judge Rohl in their application, they had reason to believe from their extensive investigation that the conspirators sought to steal all gasoline taxes, whether local, state, or federal. Plainly the officials knew, therefore, that inevitably the same conversations would concern the theft of both federal excise taxes and local and state taxes.

Levine contends that the officials must be deemed to have sought the order of August 2, 1985 as a subterfuge unless they had no "expectation" of obtaining evidence of federal tax crimes and were surprised to discover that evidence.

### A.

■ The Senate Committee report cited above makes it clear that the relevant consideration is not whether the prosecutors were surprised to intercept conversations relating to federal tax crimes. The issue is whether the original eavesdropping order was sought "in good faith" and the evidence was "incidentally" intercepted. 1968 U.S.Code Cong. and Admin.News, *supra*, at 2189.

■ The fact that the evidence relevant to offenses specified in the initial order was also relevant to offenses not so specified does not establish that the officers sought the order in bad faith.

In enacting the Federal Act Congress sought to weigh the interest in protecting "the privacy of wire and oral communications" against the "indispensable" need to intercept such communications "in the evidence gathering process in the administration of justice in the area of organized crime." *Id.* at 2177. In striking a balance Congress narrowed the kinds of offenses that would support surveillance.

It did not indiscriminately authorize eavesdropping for evidence of any federal or state crime but allowed federal officers to apply to eavesdrop in the case only of specified "intrinsically serious" federal crimes and those "characteristic of the operations of organized crime," *id.* at 2186, and state officials to apply in the case of specified serious felonies as well as those "dangerous to life, limb, or property." 18 U.S.C. § 2516(2).

Congress concluded that probable cause as to the specified offenses named in the surveillance order justified the intrusion on privacy even to the extent of permitting "otherwise intercepted" communications to be used as evidence. Provided, therefore, that the officials in good faith intend to prosecute those specified crimes and do not just concoct a "subterfuge" to gain evidence as to other crimes, there is no good reason to prohibit the use in evidence of incidentally-revealed matter even if its interception is expected. The privacy of the suspects has already been invaded.

■ A factor pertinent to the determination of good faith may be whether the officials concealed from the judge issuing or extending the original warrant the fact that they foresaw a high likelihood that evidence of other crimes would be revealed. To hide that fact might give rise to an inference of bad faith. *Cf. People v. Winograd*, 68 N.Y.2d 396, 509 N.Y.S.2d 512, 502 N.E.2d 189 (1986); *People v. DiStefano*, 38 N.Y.2d 640, 645, 382 N.Y.S.2d 5, 345 N.E.

2d 548 (1976). But the mere fact that the prosecutors believe that the surveillance will reveal other crimes, and disclose that belief to the issuing judge, does not justify a conclusion of bad faith. Particularly is that so here where the prosecutors informed Judge Rohl from the outset that it was all but inevitable that the scheme to steal motor fuel excise taxes would encompass all such taxes irrespective of the jurisdiction imposing them.

█ In short, in this case "good faith" turns not on whether the interceptions were "inadvertent" or "unanticipated" but on whether they were "incidental." As the First Circuit said in *United States v. McKinnon, supra,* 721 F.2d at 22–23:

> While an interception that is unanticipated is *a fortiori* incidental, the converse is not true: something does not have to be unanticipated in order to be incidental. Evidence of crimes other than those authorized in a wiretap warrant are intercepted "incidentally" when they are the by-product of a bona fide investigation of crimes specified in a valid warrant. Congress did not intend that a suspect be insulated from evidence of one of his illegal activities gathered during the course of a bona fide investigation of another of his illegal activities merely because law enforcement agents are aware of his diversified criminal portfolio.

The government engages in "subterfuge" surveillance when it has no good faith intention of investigating and prosecuting the specified offenses. Had the prosecutors here never used the evidence of the state offenses set forth in the original order and never attempted to prosecute such offenses, the court might infer that they were uninterested in the state crimes and had sought the eavesdropping order only to get evidence of the federal offenses. But many of the intercepted conversations were played for the Suffolk County grand jury, which handed down a 1,004 count indictment charging Levine and nine others with, among other crimes, those set forth in the initial order.

The court concludes that the officials met the requirement of the Federal Act that they act in good faith.

B.

█ Levine says that New York State decisions construing the state legislation are controlling and are inconsistent with the foregoing conclusions.

Of course, state statutory provisions less stringent than their federal counterparts do not apply either in federal or state proceedings. 18 U.S.C. § 2515. However, a federal court considering the admissibility of evidence obtained under a state eavesdropping order must apply those more stringent state statutory requirements "designed to protect an individual's right of privacy." *United States v. Sotomayor,* 592 F.2d 1219, 1225 (2d Cir.), *cert. denied sub nom Crespo v. United States,* 442 U.S. 919, 99 S.Ct. 2842, 61 L.Ed.2d 286 (1979).

Levine cites *People v. Schipani,* 56 A.D. 2d 126, 391 N.Y.S.2d 875, 879 (2d Dep't 1977), for the proposition that New York State law permits evidentiary use of communications other than those sought in the order only if the communications relate to "designated offenses," that is, crimes as to which the officials could have made an independent application for eavesdropping. In that case the Appellate Division, Second Department, suppressed evidence of crimes other than those specified in the eavesdropping order because of the "fatal" failure of the investigators to seek an amendment permitting such use. The court then added that the right to seek an amendment "would rest on a very tenuous basis," and went on to construe not the state statute but the Federal Act to prohibit an amendment to allow in evidence communications "as to offenses which could not be themselves the subject of a valid warrant in the first instance."

This dictum is contrary to a later Appellate Division case, *People v. Calogero,* 84 A.D.2d 667, 446 N.Y.S.2d 615 (4th Dept. 1981). In any event, an intermediate state court's opinion as to the meaning of the Federal Act is not authority this court feels bound to respect. For reasons stated

above, this court deems it plain that that act permits an amendment authorizing use of evidence which could not be the subject of the initial eavesdropping order.

Levine also contends that two opinions of the New York Court of Appeals, *People v. Winograd*, 68 N.Y.2d 383, 509 N.Y.S.2d 512, 502 N.E.2d 189 (1986) and *People v. DiStefano*, 38 N.Y.2d 640, 382 N.Y.S.2d 5, 345 N.E.2d 548 (1976), support the argument that New York law requires as a condition of admissibility that intercepted communications as to offenses not named in the order must be "unanticipated" and the interception "inadvertent." But the remarks in both of those cases to that effect are merely dicta. In the *DiStefano* case the court determined that the interceptions were "inadvertent." In *Winograd* the court did not reach the defendant's argument that the conversations were not inadvertently intercepted.

Moreover, both cases, in saying that the communications must be "unanticipated," purported to construe the Federal Act. *Winograd, supra,* 68 N.Y.2d at 391–92, 509 N.Y.S.2d 512, 502 N.E.2d 189; *DiStefano, supra,* 38 N.Y.2d at 649–50, 382 N.Y.S.2d 5, 345 N.E.2d 548. This court is not obliged to accept the state court's interpretation of federal law. *Cf. Michigan v. Long,* 463 U.S. 1032, 1040, 103 S.Ct. 3469, 3476, 77 L.Ed.2d 1201 (1983) (state court decision "rest[ing] primarily on federal law" or "interwoven with the federal law" reviewable by Supreme Court as a federal decision).

This court concludes that the prosecutors sought the eavesdropping order in good faith and not as a mere subterfuge to obtain evidence of federal excise tax crimes.

## III. WHETHER THE PROSECUTORS SOUGHT AMENDMENT OF THE SURVEILLANCE ORDER AS SOON AS PRACTICABLE

As described above, where the prosecutors wish to use "otherwise intercepted" communications in evidence the Federal Act requires them to apply to a judge "as soon as practicable." 18 U.S.C. § 2517(5). The state law contains a comparable provision. C.P.L. § 700.65(4). The New York Attorney General and Assistant Attorney-

in-Charge of the Federal Strike Force made such an application on November 8, 1985, about three months after surveillance began. They knew, of course, from the outset that they would hear communications about federal tax crimes. Levine therefore urges that the phrase "as soon as practicable" means in this case at the very start of surveillance or at least as soon as the investigators intercepted the first communication as to federal excise tax crimes.

■ The federal courts have construed the "as soon as practicable" requirement flexibly and "in a common-sense fashion." *United States v. Marion,* 535 F.2d 697, 707 (2d Cir.1976). Its primary purpose is to assure judicial scrutiny before the communications are used in evidence in a proceeding. *United States v. Aloi,* 449 F.Supp 698, 716 (E.D.N.Y.1977). Because the requirement applies only where the communications are to be offered in evidence, 18 U.S.C. § 2517(5), the statute contemplates that the prosecutors should have a period of time to decide whether to make such use of them. *See Marion, supra,* 535 F.2d at 707.

■ Moreover, *Marion* held that even where the government fails to obtain a specific order under 18 U.S.C. § 2517(5), it may use in evidence the communications relating to offenses other than those specified in the original authorization of the state judge where he has granted extensions based on affidavits informing him "that possible federal offenses might be implicated." *Marion, supra,* at 703. Here Judge Rohl was advised from the outset as well as in applications for extension that communications as to federal tax crimes would be heard, and he extended the order. The government was thus not required to obtain a formal amendment to satisfy the Federal Act with respect to communications as to federal tax crimes.

■ The amendment to use in evidence communications concerning obstruction of justice was made well within the time the federal courts have allowed. *United States v. Southard,* 700 F.2d 1, 30–31 (1st Cir.), *cert. denied,* 464 U.S. 823, 104 S.Ct.

89, 78 L.Ed.2d 97 (1983) (19 month delay); *United States v. Aloi, supra,* 449 F.Supp. at 715–16 (E.D.N.Y.1977) (3 month delay).

By affidavit of Assistant Attorney-in-Charge Laura Brevetti, the Federal Strike Force states that while it participated with state officials in the investigation, it did not take part in the initial analysis of the tapes. Only when alerted by the state team in October 1985 that Levine's communications disclosed an effort to hide and destroy records sought by federal subpoena did the Strike Force begin reviewing the tapes for evidence of obstruction of justice. The time spent reviewing those tapes was reasonable.

■ Levine contends that the New York cases have interpreted the state law "as soon as practicable" requirement more exactingly than the federal courts have construed the identical federal statutory language. The New York opinions have used language stating that the officials must seek amendment as soon as practicable "after they have obtained sufficient information which manifests probable cause to believe that a crime not covered in the original warrant has been committed." *See, e.g., People v. Winograd, supra,* 68 N.Y.2d at 393, 509 N.Y.S.2d 512, 502 N.E. 2d 189.

But *Winograd* and cases like it did not face the situation presented here. Judge Rohl was advised in the initial application that communications inevitably encompassing federal tax violations would be heard. He authorized interception of those communications. He extended the order after learning that they had in fact been intercepted. C.P.L. § 700.65(4) only requires an amendment to be obtained where "a communication which was not otherwise sought" has been intercepted. The prosecutors "sought" to intercept, and Judge Rohl authorized them to intercept, communications that would evidence federal tax crimes. It would serve no purpose of the C.P.L. to require the prosecutors to apply for an early amendment to use those communications to prosecute a federal crime in addition to a state crime. *Cf. Marion, supra,* 535 F.2d at 701, n. 5. Certainly in this case an early application for such an amendment was not required "to insure continuous good faith compliance with the original warrant." *Winograd, supra,* 68 N.Y.2d at 392, 509 N.Y.S.2d 512, 502 N.E. 2d 189.

The amendment authorizing use in evidence of the unanticipated communications showing obstruction of justice was made as soon as practicable within the meaning of C.P.L. § 700.65(4). In *Winograd* the prosecutors "failed to proffer any reason sufficient to justify" the delay. 68 N.Y.2d at 393, 509 N.Y.S.2d 512, 502 N.E.2d 189. Here, for reasons stated the government has advanced a plausible explanation.

■ In any event the court must decide the issue according to federal not state law. In *United States v. Sotomayor,* supra, 592 F.2d at 1225, the Second Circuit held that in determining whether to admit a state wiretap "only those more stringent state statutory requirements or standards that are designed to protect an individual's right of privacy, as distinguished from procedural rules that are essentially evidentiary in character" are binding on a federal court. The court ruled that New York's more stringent sealing requirement "is a post-interception procedure relating solely to the later preservation of the evidence, as contrasted to the methods used to obtain it." *Id.* at 1226.

In this case the requirement to apply "as soon as practicable" to use the communications in evidence is a procedural rule "essentially evidentiary in character."

Both the Federal Act and C.P.L. § 700.65(4) require an amendment only where the communications are to be used in evidence in a proceeding. They may be used by law enforcement officials without such an amendment in the proper performance of their official duties. 18 U.S.C. § 2517(1), (2), (5); C.P.L. § 700.65(1), (2), (4); *see, e.g., People v. Mastrodonato,* 136 Misc.2d 854, 519 N.Y.S.2d 497 (Monroe Cty. Ct.1987) (upholding use of incidental interceptions in search warrant application despite absence of amendment of wiretap order). There is thus no significant compromise of a suspect's privacy rights by post-

poning the application to use the communications in evidence to a date prior to their use. The only substantial concerns are procedural.

The court finds no violation of the "as soon as practicable" requirement, state or federal.

## IV. WHETHER PROSECUTORS ADEQUATELY EXPLORED THE AVAILABILITY OF ALTERNATIVE INVESTIGATIVE TECHNIQUES

 Levine argues that the prosecutors failed to comply with requirements under federal and state law that they explore adequately the availability of alternatives to electronic surveillance.

The Federal Act requires the government to state in its application for a surveillance order that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). Section 700.20(2)(d) of the New York Criminal Procedure Law contains almost identical language, and the courts have treated the two provisions uniformly. *See United States v. Lilla,* 699 F.2d 99, 102 (2d Cir.1983).

The requirement is "simply designed to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." *United States v. Kahn,* 415 U.S. 143, 153 n. 12, 94 S.Ct. 977, 983 n. 12, 39 L.Ed.2d 225 (1974). "Although the required showing is to 'be tested in a practical and common sense fashion,' . . . [it] must provide some basis for concluding that less intrusive investigative procedures are not feasible." *United States v. Lilla, supra,* 699 F.2d at 103 (quoting 1968 U.S. Code Cong. & Ad.News, *supra,* at 2190).

Judge Rohl concluded, and this court agrees, that the decision not to rely on the alternatives now suggested by Levine was well justified.

The prosecutors' decision not to use undercover agents was reasonable. As State Investigator Paul Murphy set forth in his affidavit, Levine purportedly belonged to an organization that was closely-knit and prone to violence. The investigators could fairly have concluded that penetration would be ineffectual at best and would risk disclosure and retribution at worst.

The investigators need not have contented themselves with statements provided by cooperating witnesses as well as Levine's own statements. The Murphy affidavit explained that evidence obtained prior to the eavesdropping order did not show the details of the various schemes and the identities of other persons and businesses involved. Moreover, the prosecutors were entitled to seek evidence to corroborate the cooperating witnesses, whose testimony is invariably attacked at trial.

The government was not required, as Levine suggests, to rely on subpoenas to obtain his records. The government had reason to believe that he kept two sets of records and did not have to trust him to turn over the accurate ones. This belief was confirmed, as is evidenced by the obstruction of justice count.

The prosecutors adequately advised Judge Rohl of the extent and nature of the investigation. Their reasons for wishing to conduct electronic surveillance were reasonable. Neither the New York law nor the Federal Act required them to cripple their investigations in the manner suggested by Levine.

## V. WHETHER THE ORIGINAL APPLICATION ESTABLISHED PROBABLE CAUSE THAT EVIDENCE OF CRIMINAL ACTIVITY WOULD BE OBTAINED

 Levine contends that the evidence submitted to obtain the original August 2, 1985 authorization was stale and insufficient to show probable cause. Levine argues chiefly that (1) most of the information provided by confidential sources and cooperating witnesses did not concern the period between mid–1984 and August 1985, and (2) this information pertained only to activities at Levine's prior place of business, not the bugged office into which Levine relocated in March 1985.

Levine relies on *United States v. Thomas*, 757 F.2d 1359 (2d Cir.), *cert. denied*, 474 U.S. 819, 106 S.Ct. 66, 88 L.Ed.2d 54 (1985), where the court suppressed evidence seized from a search of a defendant's apartment. The court held that "two-year-old evidence of participation in a heroin mill, *not* at the dwelling to be searched, is stale and cannot support a search warrant" (emphasis in original).

This case bears no resemblance to *Thomas.* Here the cooperating witnesses and undercover sources revealed the existence of a sophisticated, ongoing operation involving numerous persons and companies, hardly something likely to decay in a year's time. Levine's relocation of his office is insignificant. He continued to operate the same companies that investigators believed were fronts to avoid tax obligations. In any event, physical surveillance during the year in which Levine says the evidence became stale showed the defendant's continuing contact with other suspected gasoline bootleggers. Moreover, in June 1985, Levine, when confronted by the state tax investigators, conceded his failure to pay certain taxes due, and even then gave false information on the return.

Judge Rohl had ample cause to issue the initial surveillance warrant.

## VI. WHETHER THE SEPTEMBER 30th AUTHORIZATION WAS INVALID

Levine next contends that Judge Rohl's written order of Monday, September 30, 1985 authorizing continued surveillance was invalid because the August 29, 1985 extension expired at midnight on Friday, September 27, 1985. Levine thus urges suppression of all communications intercepted under the September 30, 1985 order and all subsequent orders. Contending that the arrival of Hurricane Gloria that weekend in New York City and Long Island created exigent circumstances, the government argues (1) that an extension order, be it oral on September 27, 1985, or written on September 30, 1985, was properly obtained, or, in the alternative, (2) that

the September 30, 1985 order was a proper new order.

The court conducted a hearing on the issue and received evidence as to the impact of Hurricane Gloria, including testimony by Judge Rohl, as well as Suffolk County Assistant District Attorney Raymond Jermyn, and New York Assistant Attorney General Vincent O'Reilly, the attorneys supervising the surveillance operation.

The court will not recount in detail the effects Hurricane Gloria had on the region. The eye of the storm passed directly over Long Island. Winds on the 27th exceeded 100 miles per hour and there was extensive flooding. More than 1,000,000 people in some 683,000 homes lost power that day. Governor Cuomo declared an emergency for New York City, Nassau and Suffolk Counties and surrounding areas. Even as late as Sunday, September 29, 1985, 400,-000 homes and businesses remained without power.

The warrant for an extension had been signed by New York Attorney General Abrams in the afternoon of September 26th, the day before the storm hit. Jermyn called Judge Rohl's chambers that day and learned that the judge would be available the next morning to consider the order. O'Reilly, who had the necessary documentation, was to meet Jermyn at Judge Rohl's chambers.

Early the next morning Jermyn learned that the Suffolk County courthouse was closed due to the storm. Over the telephone O'Reilly and Jermyn agreed to attempt to call Judge Rohl at home and arrange a meeting. Jermyn could not reach the judge because of problems with telephone service, but O'Reilly got through at about 8:00 A.M. The judge assured him that it was not humanly possible to get to his house, located in a low-lying area where the storm had hit with great ferocity. Instead, at the judge's suggestion, O'Reilly read the papers over the telephone and took notes of what was said, and the judge gave an oral extension order for further surveillance.

Despite issuance of the oral extension, as the storm subsided late that afternoon,

O'Reilly and Jermyn made further attempts to meet each other and Judge Rohl. That evening the three managed to arrange an 8:00 P.M. meeting at the Delphi Diner near the judge's home. Due to hazardous road conditions, flooding at the judge's home and communication difficulties, these efforts failed. Though the storm had passed, similar efforts to reach the judge failed on September 28th and 29th primarily because of interrupted telephone service. The court concludes that Judge Rohl was unavailable the entire weekend.

Some 70 other judges within the judicial district had authority to sign the extension order. Jermyn testified that he also made efforts on September 27th to contact at least two other judges located in areas that O'Reilly might reach. These attempts failed, and in any event, the bulk of the day was spent trying to meet Judge Rohl.

In the morning of Monday, September 30 Judge Rohl signed an order described as an extension and said to be effective September 27. The prosecutors put on record their activities over the weekend, and Judge Rohl concluded: "I think everyone has done whatever humanly was possible, and I think just the storm and hurricane itself, created such a scene, that it was humanly impossible to do it any other way."

No monitoring took place nor were monitoring agents present at the site from September 27 through September 30 until after the order was signed. The equipment remained intact; no effort to remove or inactivate it was made.

Under the C.P.L. § 700.40, "[a]t any time prior to the expiration of an eavesdropping warrant, the applicant may apply to the issuing justice, or, if he is unavailable, to another justice, for an order of extension." Temporary, oral authorization for eavesdropping is permissible "[i]n an emergency situation where imminent danger of death or serious physical injury exists and, under the circumstances, it is impractical for the applicant to prepare a written application without risk of such death or injury occurring." C.P.L. § 700.21(1).

Prosecutors must comply with the inactivation and notice requirements when any surveillance order expires. "[E]avesdropping must cease and any device installed for such purpose must be removed or permanently inactivated as soon as practicable." C.P.L. § 700.35(2). No later than 90 days after termination, the person named in the warrant must be given notice that eavesdropping took place, except upon "a showing of exigent circumstances" justifying a postponement. C.P.L. § 700.50(3), (4).

The court agrees with the government that the September 30, 1985 order was a valid new authorization and that the government complied with the inactivation and notice requirements applicable to a September 27, 1985 expiration of the previous order. The court therefore does not pass on the government's other contention.

Although the September 30, 1985 order was denominated an extension, its supporting documentation satisfied all the requirements of a new order. The question is whether the government complied with the notice and inactivation requirements applicable to a presumed expiry on September 27 of the August 29 order.

By order dated December 20, 1985, less than 90 days after September 27th, Judge Rohl authorized postponement of notice until April 15, 1986 with respect to the August 2 order and the August 29 extension. Earlier notification to Levine would have alerted him to the continued surveillance. Judge Rohl thus sensibly concluded in accordance with C.P.L. § 700.50(4) that "exigent circumstances" justified postponement. This court has no basis for disagreeing with that conclusion. To have aborted the entire investigation because of the unusual circumstances occasioned by Hurricane Gloria would have served no legitimate purpose.

The requirement of C.P.L. § 700.35(2) that after termination "eavesdropping must cease and any device installed for such purpose must be removed or inactivated as soon as practicable" was also satisfied. That section does not require instant inactivation. It must be done "as soon as

practicable." Occupied as they were with attempting to reach Judge Rohl, attorneys Jermyn and O'Reilly could not have been expected to launch a simultaneous effort to inactivate the equipment. As O'Reilly testified at the hearing, making the necessary security and technological arrangements without advance notice in an area reeling from a hurricane would not have been feasible.

Levine relies on *People v. Gallina,* 66 N.Y.2d 52, 57–58, 495 N.Y.S.2d 9, 485 N.E. 2d 216 (1985), in which the court, construing C.P.L. § 700.35(2), observed: "The danger of inadequate inactivation is, of course, that an unauthorized eavesdropping will result.... That no unauthorized eavesdropping may have occurred is beside the point, because it is the potential for abuse that is the focus of analysis."

In that case, an authorization to eavesdrop expired on September 9, 1981. The investigators turned off the equipment but left it intact until September 15, 1981 when they obtained a new authorization. The only explanations for the six day delay were difficulties in translating prior intercepted conversations (material deemed unnecessary by the court to establish probable cause for an extension) and mechanical problems amounting to a single broken typewriter. Because they anticipated receiving a new authorization, the investigators made no effort to inactivate the equipment. Holding that the September 15, 1981 order was not a valid extension and could not be justified as a new order because the prosecutors failed to meet the inactivation requirement, the court suppressed communications intercepted pursuant to the order.

O'Reilly conceded in this case that the investigation team never intended to inactivate the equipment since they believed either that the oral extension was valid or that Judge Rohl would sign an order some time that weekend and certainly by Monday morning. In this court's view, in contrast to the apparently cavalier attitude of the prosecutors in the *Gallina* case, the responsible attorneys in this case made commendable, good faith efforts to comply with the applicable statutory provisions. Judge Rohl's suggestion that an oral order was appropriate under the circumstances together with their repeated efforts to reach him physically gave the supervising attorneys, unlike those in *Gallina,* well-founded reason to believe they were doing what the law realistically required.

Levine criticizes the prosecutors for not applying early for an extension in anticipation of the hurricane and for failing to make further attempts to obtain another judge's signature. Of course, hindsight is always infallible. The prosecutors arranged to meet Judge Rohl in the morning of September 27, 1985, and this court will not now find that they should have anticipated the severity and direction of the storm.

While the prosecutors could perhaps have located another judge, it was reasonable for them to dedicate their efforts to reaching Judge Rohl, the supervising judicial officer familiar with the investigation. This case is not like *People v. Basilicato,* 64 N.Y.2d 103, 485 N.Y.S.2d 7, 474 N.E.2d 215 (1984), where prosecutors made no attempt to contact a judge over the weekend, or *People v. Winograd, supra,* where they had advance knowledge that a judge would be unavailable for religious reasons.

Under the conditions the prosecutors faced, even if they had intended to inactivate the surveillance equipment, they could not have launched a three-pronged assault to (1) reach Judge Rohl, (2) find another judge and (3) inactivate the equipment.

The court does not consider it significant that the September 30, 1985 order was denominated an extension. The relevant question is whether the actions of the attorneys complied with statutory requisites, not whether they characterized their efforts accurately.

Because of the unusual circumstances of this case the court holds that the September 30, 1985 order was a valid new authorization and that all requirements pertaining to any expiration of the old extension on September 27, 1985 were met.

## VII. MINIMIZATION OF UNAUTHORIZED INTERCEPTIONS

Levine contends that the surveillance was invalid because the officials (1) exceeded the eavesdropping authorization and (2) did not adequately minimize the interception of communications between Levine and his attorneys.

### A.

 The eavesdropping orders authorized the interception and recording of "certain oral communications" in Levine's office and the videotaping and recording of the physical activities of Levine and others. The officials also obtained a pen register, enabling them to determine the telephone numbers of outgoing calls, but did not apply for a wiretap order. The installed equipment recorded both face to face conversations and one side of Levine's telephone conversations with others.

Levine argues that his remarks into the telephone to others not overheard or recorded do not constitute a "communication" within the meaning of the orders or the pertinent statutes because the officials could hear and recorded only part of a "conversation or discussion."

Section 250.00 of the New York Penal Law, incorporated by C.P.L. § 700.05(1), distinguishes between wiretapping and mechanical overhearing of a conversation. The former relates to the overhearing or recording of "a telephonic or telegraphic communication" without the consent of "either the sender or receiver." Penal Law § 250.00(1). The latter relates to the overhearing or recording "of a conversation or discussion" without the consent of "at least one party thereto." Penal Law § 250.00(2). Both means of "eavesdropping" are made unlawful unless authorized pursuant to C.P.L. §§ 700.05–700.70.

Under C.P.L. § 700.15 on application a judge may permit eavesdropping upon specified conditions. C.P.L. § 700.20 requires the application to contain, among other things, a statement of the identity of "the person" committing the designated offense "and whose communications are to be intercepted."

C.P.L. § 700.05(3) defines the term "intercepted communication" as follows:

"Intercepted communication" means (a) a telephonic or telegraphic communication which was intentionally overheard or recorded by a person other than the sender or receiver thereof, without the consent of the sender or receiver, by means of any instrument, device or equipment, or (b) a conversation or discussion which was intentionally overheard or recorded, without the consent of at least one party thereto, by a person not present thereat, by means of any instrument, device or equipment. The term "contents," when used with respect to a communication, includes any information concerning the identity of the parties to such communications, and the existence, substance, purport, or meaning of that communication. The term "communication" includes conversation and discussion.

While perhaps the legislation presupposes that the person overheard was speaking to someone else and therefore was "conversing," the language of C.P.L. § 700.20 makes it clear that the law did not contemplate that statements could be validly intercepted only if the remarks of the other person were heard. That section provides that it is "the person" who is committing the offense "whose communications are to be intercepted."

The legislature could have prohibited the interception of the malfeasor's statements unless the officials also intercepted comments by the persons to whom the statements were addressed. But there is no reason in logic or policy why the legislature would have made such a choice. Suppose, for example, the miscreant were to instruct an underling, who never says a word, "get me five pounds of heroin." The underling nods and goes about his assigned task. It would be fatuous to say that what was said was not a "communication." Indeed, when officials install bugs they often pick up only one side of a conversation because the other party is so distant from the microphone that his remarks cannot be heard.

This court declines to make the propriety of the interception of relevant statements in a conversation turn on whether those who heard them made audible reply.

The decisions relied upon by Levine do not require a different result. In *People v. Basilicato, supra,* the warrant authorized wiretapping of telephone lines. The defendants left the receiver off the hook to avoid interruption by incoming calls. The recording equipment, activated when defendants removed the receiver from the hook, picked up conversations within the room. The court suppressed those conversations and evidence deriving from them, holding that since the warrant authorized only wiretapping, that is, the interception of "telephonic communications," interception of conversations in the room went beyond the scope of the warrant.

Here the warrants authorized the interception of "oral communications" within Levine's office. He and others named in the warrant did make oral communications within the office as they spoke into the telephone, and the equipment recorded those oral communications. The officials did not pick up the words from the telephone wires and thus did not go beyond the scope of the warrants.

In *People v. Fortmuller,* 83 Misc.2d 850, 373 N.Y.S.2d 469 (Suffolk Cty.Ct.1975), also cited by Levine, the court denied a motion to suppress evidence obtained pursuant to an eavesdropping warrant. The application for the warrant alleged that an informant wearing a recording device recorded an intermediary placing a bet over the telephone with defendant. The defendant moved to suppress all evidence obtained pursuant to the warrant because the initial recording was made without a warrant and thus constituted an unauthorized tape recording of a telephone conversation. The prosecutor argued that what the informant heard and recorded could not be a telephonic communication since only one side of the conversation was heard. After quoting C.P.L. § 700.05(3), the court said

Since what the informant purportedly heard and transmitted was only one end of the conversation, what was overheard was not a communication as that term is defined in the definition's last sentence. Certainly the informant's known presence precludes a finding that there was an intercepted communication within the meaning of CPL § 700.05, subd. 3(b).

The dictum in the opinion that the one side of the conversation heard was not a "communication" within the meaning of the last sentence of C.P.L. § 700.05 is consistent with Levine's argument here. However, the court did not need to reach the point since the intermediary's communication to the informant was not made over the telephone wire and therefore was not a "telephonic" communication to him within the meaning of C.P.L. § 700.05(3)(a).

Moreover, the *Fortmuller* opinion of County Judge Oscar Mirov is entitled to no more weight than the opinion of Judge Rohl in this case, who was aware before signing the order renewing the warrant that the applications were based on in part interceptions of statements made into a telephone.

The holding in *Goldman v. United States,* 316 U.S. 129, 62 S.Ct. 993, 86 L.Ed. 1322 (1942), is not on point. There, as in *Fortmuller,* a witness heard words spoken in the next room into a telephone receiver. The court held that since the witness did not hear them over the wire they should not be suppressed because they were not "communications by wire" within the meaning of the then Section 605 of the Federal Communications Act. In *United States v. Borgese,* 235 F.Supp. 286 (S.D.N.Y.1964), where a radio transmitter placed in a public telephone booth intercepted what was said into a telephone, the court followed the *Goldman* holding. In dicta the court also said it was "inclined to believe" that the agents did not violate the then § 738(2) of the New York Penal Law, making it unlawful by means of an instrument to overhear a "conversation or discussion," reasoning that it takes words from more than one person to constitute a "conversation or discussion." *Id.* 235 F.Supp. at 291–2. This court declines to follow this dictum.

The court concludes that the officials did not exceed the eavesdropping authorization by intercepting those oral statements made in Levine's office over the telephone.

### B.

■ Levine contends that the surveillance was invalid because of the interception of privileged conversations between Levine and his attorneys. The government agrees that the officials were required to make a good faith effort to minimize interception of attorney-client communications. *See* C.P.L. § 700.30(7).

Prior to the commencement of surveillance on August 5, 1985 government lawyers instructed the monitoring agents to make a good faith effort to avoid interception of impertinent or privileged communications. Each monitor attended lectures and received detailed written instructions, reciting that agents "may not listen to any conversation which which would fall under any legal privilege," and giving the following admonition:

> Attorney/Client: Absolute rule requires that you must never listen to or record conversations between the subject and his attorney. If an attorney's name or phone number is determined at some point during monitoring, these should be posted at the plant.

The government lawyers sent memoranda stating the names of the attorneys, as their identities became known, as well as the names of their clients, and the procedure to be followed when an attorney's words were intercepted. A September 2, 1985 memorandum directed that the "appearance at the scene of any person known to be an attorney shall cause all monitoring of any room where the attorney is located, to cease" even though persons other than their clients are present. In that event monitors were to call one of the government lawyers and not recommence monitoring absent departure of the attorney or approval of the government lawyers. The instructions further directed that if the monitors determined that a telephone call was being made to an attorney they should not intercept the conversation. The memorandum listed the names of six attorneys known to represent the targets. On No-

vember 20, 1985 a similar memorandum identified three additional such attorneys.

The government admits that despite these efforts some conversations between Levine and attorneys were intercepted. Levine cites eight instances of monitoring during the five months of surveillance as violative of his attorney-client privilege. The government says that several of these occurred before the monitors realized an attorney was conversing but that after they so realized they simply spot monitored. The government lawyers authorized the monitors to continue the interceptions in three instances where third persons were present. Levine claims that in two of these instances the third persons were either retained or employed by him, and that therefore the privilege applied.

Even acting in the utmost good faith, the monitors clearly could not prevent the interception of some privileged statements. The test is whether they established and made a conscientious effort to follow appropriate procedures to minimize those interceptions, that is, "whether, realistically considered, there was a good faith attempt to affirmatively avoid" improper interceptions. *People v. Brenes*, 42 N.Y.2d 41, 47, 396 N.Y.S.2d 629, 364 N.E.2d 1322 (1977).

The court has examined the record as to each instance of monitoring claimed by Levine to have violated his attorney-client privilege and is satisfied that the government made such a good faith effort. Although there were times when the monitors intercepted privileged communications, there is no reason to suppress the fruits of the entire surveillance. Those statements intercepted may not be received in evidence if in fact the communications were between Levine and a lawyer and the other prerequisites to the invocation of the privilege are met. To the extent the parties disagree on the facts determinative of whether certain statements were privileged, the court will hold a hearing to resolve the issue.

### VIII. ALLEGED BREACH OF AGREEMENT NOT TO USE STATEMENTS OF LEVINE OR REVEAL HIS IDENTITY

■ Levine contends that government officials obtained information from him by

implied and express promises that his statements would be "off the record," or at least that his identity would remain confidential. Levine says the government broke these promises by including his statements and the fact that he had met with government officials in the August 2, 1985 application for permission to eavesdrop, and that without those statements, there would have been no probable cause to support the original eavesdropping order. He thus seeks suppression of the statements and of all communications intercepted by electronic surveillance. *See United States v. Denno,* 259 F.Supp. 784 (S.D.N.Y.1966).

The court held a hearing on this issue, admitted into evidence affidavits and other documentation, and heard in relevant part the testimony of Special Agent Ronald Noel of the Federal Bureau of Investigation and Assistant Attorney-in-Charge of the Strike Force Laura Brevetti.

Noel had participated in the investigation of the theft of oil and gasoline taxes on Long Island. He testified that sources had revealed that Levine had been beaten in connection with his gasoline business by one John Mussachia, a target of the investigation. Noel approached Levine on January 16, 1984, and the two held a series of meetings between that date and May 1, 1984 with other agents and on some occasions also with associates and counsel of Levine. They often discussed Levine's safety. Though the investigators had cause to suspect Levine, he maintained his innocence. Noel testified that at no time during this period was Levine a target of the investigation.

The hearing elicited no evidence that the agents expressly or impliedly promised that Levine's statements would not be used against him. There is also no evidence that Noel or his cohorts expressly promised to maintain Levine's confidentiality. He argues that in expressing concern for and discussing his safety agents recognized the threat to him should his discussions with agents become public knowledge and thus impliedly promised to maintain his confidentiality.

There is no basis for such an inference. Noel testified that Levine neither requested confidentiality nor expressed any reluctance to speak to the agents. Whatever Levine's subjective expectations were, there is no evidence that the agents communicated a promise to him.

At a June 1, 1984 meeting Brevetti represented the Federal Strike Force in discussions with Levine and his counsel concerning Levine's possible cooperation. Brevetti informed Levine that he was not a target of the federal grand jury investigation but asked him to become a cooperating witness. She opined that his life was in danger, and they discussed the possibility of his entering the Federal Witness Protection Program. Brevetti told Levine "that the fact that he was present in government offices would not be made known to persons other than Strike Force personnel involved in the investigation." Ultimately, Levine chose not to cooperate with the Strike Force.

Brevetti testified that the promise was conditioned on Levine's cooperating. When Levine chose not to do so and instead to obtain protection by allying himself with persons in organized crime, the government no longer considered it had an obligation to preserve his confidentiality.

This is the only sensible construction of Brevetti's promise. The purpose of the meeting was to discuss with Levine possible arrangements should he decide to cooperate. The government made offers he chose not to accept. At best, the promise was not to reveal his presence at the meeting pending his decision. It was not a gratuitous bestowal of confidentiality on one who might not (and did not) cooperate and instead allied himself with those the Strike Force was charged with prosecuting.

## IX. CONCLUSION

Levine's motions are denied, except to the extent that the court has stated that, if requested, it will hold a hearing as to specific alleged privileged attorney-client communications.

So ordered.